**STATE of Alaska, Petitioner,**

v.

**Melvin J. ECHOLS, Respondent.**

**No. A–2818.**

Court of Appeals of Alaska.

June 1, 1990.

---

Cynthia M. Hora, Asst. Atty. Gen., Office of Sp. Prosecutions and Appeals, Anchorage, and Douglas B. Baily, Atty. Gen., Juneau, for petitioner.

James H. McComas, Anchorage, for respondent.

## OPINION

Before BRYNER, C.J., and COATS and SINGLETON, JJ.

COATS, Judge.

The grand jury indicted Melvin J. Echols for three counts of sexual abuse of a minor, Echols' daughter W.E., and two counts of attempted sexual abuse against W.E. The grand jury also indicted Echols on charges for sexually and physically abusing another daughter, T.E., and indicted Echols' wife, Arthur, on charges that she had physically abused T.E. All of the charges were consolidated for trial. During the trial, Superior Court Judge Mark C. Rowland ordered two of the counts which charged Melvin Echols with sexually abusing W.E. to be dismissed in the interest of justice after the state refused to grant use immunity to a critical witness. *See* Alaska R.Crim.P. 43(c). The state petitioned for review, asking this court to reverse Judge Rowland's decision dismissing the two counts. We granted review and now affirm.

It is necessary for us to set forth an extensive factual background to explain our decision in this case. In June 1987, W.E., who was fifteen years old at the time, told her mother, Arthur Echols, that her father, Melvin Echols, had sexually abused her. On September 6, W.E. reported the abuse to Pearl Bingham, a woman who had experience as a foster parent. When W.E. spoke to Bingham, she was accompanied by her sister, R.E. Bingham testified at trial that W.E. was crying and upset and told her that Echols had engaged in sexual touching and sexual intercourse with her. Bingham called the police and Officer Thomas Oels responded. Oels took statements from W.E. and R.E. Oels testified at trial that W.E. cried during the interview and was uncomfortable talking about the sexual acts. He testified that R.E. helped W.E. remember some of the specific facts such as dates. He stated that W.E. clearly wanted to stay at Bingham's home. Oels tape-recorded W.E.'s statement. In the taped statement, Oels explained to W.E. that he was a police officer who was there to investigate a charge of sexual abuse of a minor. W.E. told Oels that her last sexual contact with Melvin Echols was on June 7. She stated that Echols had intercourse with her three separate times and that the first time had been in February 1987. Echols was arrested on September 30, 1987, following the investigation of W.E.'s charges.

On October 3, 1987, W.E. went to the office of her father's attorney. She was again accompanied by her sister, R.E. W.E. made a sworn statement that her father had never sexually abused her.

W.E. said that she made the earlier charges so that she could live in a foster home and have more independence than she had at her parents' home. W.E. stated that she had made the allegations of sexual abuse based on the experiences of her friend, V.S. V.S. had previously made charges that her father had sexually abused her, and based on these charges, V.S. had been placed in a foster home. W.E. stated that V.S. had accompanied her to Bingham's house on September 6 when W.E. told Bingham that her father had sexually abused her. W.E. said that V.S. had impersonated R.E.

W.E. testified before the grand jury on October 9, 1987. W.E. denied that her father, Melvin Echols, had intercourse with her. She stated that she had lied to Bingham, Oels, and her social worker. She testified that she had fabricated the allegations against her father in order to be like her friend V.S., who was living in a foster home.

W.E. later returned to the grand jury and recanted her earlier testimony. She testified that Echols had intercourse with her once in February or March. W.E. testified that R.E. told her to say that the abuse had not occurred and encouraged her to tell the "V.S." story to Echols' attorney. W.E. stated that she wanted to live in a foster home like her friend V.S. because she was being molested at home.

R.E. also testified before the grand jury on October 9. R.E. testified that she had been subjected to beatings by both of her parents and that the beatings by her father had left permanent scars on her body. She also testified that she witnessed Melvin Echols beat T.E. on November 4, 1983. However, when the prosecutor asked R.E. whether she told Officer Oels that her father had sexually molested her and asked her about having gone to see Bingham with W.E., R.E. stated, "I don't recall." At that point the prosecutor excused R.E. because R.E.'s lawyer was not available. The prosecutor indicated that she did not want to put R.E. in a position of facing perjury charges by putting further questions to her before the grand jury.

At a later session of the grand jury, T.E. testified that R.E. had told T.E. that T.E. had lied to the grand jury and that "if Daddy goes to jail I'm ... kicking those ... people's ... asses and yours too." T.E. testified that she considered this to be a threat and that R.E. did not want T.E. to testify against her father at trial.

The grand jury indicted R.E. on six counts of perjury and witness tampering. R.E. then entered into a plea agreement with the state. R.E. agreed to plead no contest to one count of witness tampering in violation of AS 11.56.540(a)(1); the state agreed to dismiss the remaining charges at the time of R.E.'s sentencing. As part of the plea agreement, R.E. agreed to give truthful testimony in any official proceeding involving her parents. R.E. signed a sworn statement that she had witnessed Melvin Echols beat T.E. with an extension cord, after which her parents sent her to California. R.E. claimed that her father had physically and sexually abused her and that the physical abuse had left marks. She admitted having gone with W.E. to Bingham's house. R.E. stated that she and W.E. and V.S. had concocted the "V.S." story because R.E. and W.E. did not want to get into trouble with their parents. Finally, R.E. claimed that Arthur Echols had told them to see Melvin Echols' attorney and tell the "V.S." story.

Melvin and Arthur Echols' trial began on December 5, 1988. In her opening statement, the prosecuting attorney told the jury that R.E. would be a witness for the state. The prosecutor stated that R.E. would testify about an extensive history of physical abuse which she and her sisters had suffered at the hands of Melvin and Arthur Echols. The prosecutor told the jury that R.E. had extensive scarring on her body where she had been beaten by her father. The prosecutor also indicated that R.E. would verify that her parents beat T.E. The prosecutor discussed with the jury the fact that R.E. had been convicted of witness tampering and would be testifying pursuant to an agreement with the state.

At the trial, the state called ten witnesses who testified regarding the charges of physical and sexual abuse of T.E. The state next called W.E., who recanted her accusations against Melvin Echols. She denied telling anyone except Bingham and Oels that Echols had sexually abused her. W.E. claimed that she had accused Melvin Echols of sexually abusing her so that she could move out of her parents' house and live in a foster home. W.E. stated that she did not think that she would get Melvin Echols in trouble by making these accusations. W.E. also asserted that she had been threatened by the prosecutor between her first and second grand jury appearances. Following W.E.'s testimony, the state presented several witnesses who testified that W.E. had told them that she had been sexually abused by Melvin Echols.

Two days after the start of the trial, a police investigator discovered from school records that R.E. had been in California at the time that R.E. claimed that she had witnessed Melvin Echols beat T.E. Further investigation revealed that R.E. did not have any scars on her body from the alleged beatings by Melvin Echols. The prosecutor informed the court of these discoveries but indicated that she still intended to call R.E. as a witness. However, it became clear that R.E. would claim her privilege against self-incrimination if called to testify. The prosecutor then stated that she would not call R.E. as a witness since R.E. was unavailable given her intent to exercise her privilege against self-incrimination. Melvin Echols' attorney then announced his intention to call R.E. and stated that her testimony was crucial to his case. The attorney asked Judge Rowland to direct the state to grant use immunity to R.E. or to dismiss the case.

The following day, the prosecutor indicated that the state would not grant immunity to R.E. because R.E. was a codefendant and because the state anticipated filing future charges against her arising from the recently discovered false statements. In fact, five additional perjury charges had apparently already been drawn up resulting from the recent discoveries, accordingly subjecting R.E. to a total of eleven counts

since the state had also indicated that it would seek to cancel the immunity agreement. Melvin Echols made an offer of proof that if R.E. were called as a witness, she would testify that she and W.E. concocted W.E.'s accusations against him because W.E. wanted to live in a foster home, explaining that W.E. wanted to live in a foster home because her parents were very restrictive. R.E. would also testify that she and W.E. based their story on the experiences of their friend V.S. who was living in a foster home by virtue of making a similar complaint. Finally, Melvin Echols indicated that R.E. would testify that she had lied to Oels and the grand jury because she was pressured by the state because of the threat of perjury charges and the fact that she was on probation on charges in California.

Judge Rowland concluded that R.E.'s testimony was essential if Echols were to receive a fair trial. He found that the evidence was not available from other sources and that R.E. had a valid fifth amendment claim. Judge Rowland also concluded that the state did not have a strong interest in refusing to grant R.E. use immunity for her testimony. He believed that the court had no independent authority to grant a witness immunity, but he indicated that he would dismiss the case in the interest of justice pursuant to Criminal Rule 43(c) if the state failed to grant immunity to R.E. In response to this, the prosecutor stated that she could not offer a grant of immunity without authorization from the Department of Law, but she indicated that she expected to be able to obtain an offer of immunity. However, the next day the prosecutor indicated that the state would not grant R.E. immunity for purposes of trial. The state contended that granting R.E. immunity would impede the state's prosecution of other criminal charges against R.E., and that the state did not want to sanction the presentation of testimony which it considered to be perjury at trial. However, the state did offer to grant use immunity to R.E. for the purposes of holding an evidentiary hearing; the prosecutor stated that the "governmental objec-

tive would be satisfied if she did tell the truth" but, without hearing her testimony at an evidentiary hearing, "we don't know whether this witness is going to tell the truth."

Judge Rowland again stated that he believed that R.E.'s proposed testimony was critical to Melvin Echols' case and that it would be unfair to not have the jury evaluate whether W.E. and R.E. had contrived the accusations against Melvin Echols. Judge Rowland concluded that the jury, as the trier of fact, could properly evaluate R.E.'s credibility. Judge Rowland told the state that it could either elect to grant R.E. use immunity or face dismissal of the two remaining counts where her expected testimony was relevant.[1] The state declined to grant immunity. The state sought a stay, which was granted, for the purpose of seeking appellate review. This court denied the state's petition for review, without prejudice to the state to reapply in the event that Judge Rowland dismissed the counts. Judge Rowland subsequently dismissed the two counts under Criminal Rule 43(c). The trial continued, and the jury convicted Melvin Echols on the three remaining counts of physically and sexually abusing T.E. Arthur Echols was also convicted on one count of physically abusing T.E.

The state contends that Judge Rowland did not have the authority to order the state to confer use immunity on R.E. The state argues that Judge Rowland's order violated the doctrine of separation of powers and that Melvin Echols did not have a constitutional right to have the state immunize R.E. even if she was a critical witness to his defense. The state contends that, even if Judge Rowland did have the authority to require that the state grant a witness use immunity or face dismissal of the charges in some cases, Judge Rowland abused his discretion when he dismissed the charges under Criminal Rule 43(c).

Alaska Statute 12.50.101(a) provides that a witness may not refuse to testify on the ground of self-incrimination if under court order to testify. Assuming full compliance with the order, the witness receives what is normally characterized as "use" or "use and derivative use" immunity; that is, "no testimony ... compelled under the order, or information directly or indirectly derived from that testimony ..., may be used against the witness in a criminal case, except in a prosecution based on perjury, giving a false statement, or otherwise providing false information, or hindering prosecution." Such an order may be granted by the district or superior court "upon the application of the attorney general or the attorney general's designee...." AS 12.-50.101(b). The statute permits the attorney general to seek immunity when "the testimony ... may be necessary to the administration of criminal justice[.]" AS 12.50.101(d)(1).

In *DeMan v. State*, 677 P.2d 903, 909 (Alaska App.1984) (citations omitted), we discussed whether the trial court erred in refusing to grant immunity to two codefendants of DeMan so that they would be available to testify in his defense at trial. We stated:

There are conflicting views as to whether a trial court has the inherent authority to compel the prosecution to grant immunity to a defense witness. We need not decide the issue in this case. Even in those jurisdictions most willing to permit judicially compelled immunity for defense witnesses, such immunity is considered appropriate only when necessary to remedy prosecutorial misconduct or when the prosecution does not present any justification for withholding immunity. Courts uniformly recognize that where, as in this case, the prosecution demonstrates a legitimate and substantial interest in prosecuting the witness whose testimony the defendant seeks to compel, and where the potential charges against the witness arise from the same transaction as the charges against the

---

**1.** The other three counts regarding Melvin Echols' alleged abuse of W.E. had previously been voluntarily dismissed by the state.

defendant, immunity cannot properly be ordered.

Thus, even under the most expansive view, it appears that the court would rarely have the authority to order the state to immunize a defense witness.[2]

Alaska Rule of Criminal Procedure 43(c) provides:

> The court may, either on its own motion or upon the application of the prosecuting attorney, and in the furtherance of justice, order an action, after indictment or waiver of indictment, to be dismissed. The reasons for the dismissal shall be set forth in the order.

The specific question in this case is whether Criminal Rule 43(c) authorized Judge Rowland to order the state to give use immunity to R.E. or face dismissal of charges in the interest of justice.

At common law, the power to dismiss a case rested exclusively with the prosecuting authority. However, many states have modified this common law principle, generally requiring judicial consent for dismissal. *See Manning v. Engelkes*, 281 N.W.2d 7, 10–11 (Iowa 1979) (collecting authority). Some states, including Alaska, have modified the common law further, authorizing the court to dismiss a criminal indictment on its own motion in the interest of justice, without regard to the prosecutor's position. *People v. Panibianci*, 134 Misc.2d 274, 510 N.Y.S.2d 801, 802 (Sup.Ct.1986); *State v. Sonneland*, 80 Wash.2d 343, 494 P.2d 469, 475 (1972) (Hale, J., dissenting). Several jurisdictions, including Alaska, have made this modification in the common law by statute or criminal rule; all but one state that has made this modification use language nearly identical to that of Rule 43(c).[3] It is significant that federal courts,

---

**2.** In general, courts have been reluctant to confer immunity on defense witnesses either directly or indirectly. *See* Annot., *Right of Defendant in Criminal Proceedings to Have Immunity From Prosecution Granted to Defense Witnesses*, 4 A.L.R. 4th 617 (1981, Supp.1989). However, the Third Circuit in *Government of the Virgin Islands v. Smith*, 615 F.2d 964, 971–72 (3d Cir. 1980), did indicate that there was authority for a defendant to obtain judicial immunity for a defense witness to protect the defendant's due process rights in certain narrow situations. The court listed five requirements which the defendant must meet in order to obtain immunity for a witness: (1) the defendant must properly seek immunity in the trial court; (2) the defendant must show that the witness is able to testify; (3) the defendant must show that the testimony is clearly exculpatory; (4) the defendant must show that the testimony is essential to the defendant's case; and (5) the court must find that there is no strong countervailing governmental interest. *Id.* at 972. One factor in measuring the government's countervailing interest is how significantly a grant of immunity would impair future prosecutions. Some courts have suggested that if the prosecution has already completed its criminal investigation of the witness, its burden to show that its evidence came from sources independent of the immunized testimony would be easily met. *United States v. Pennell*, 737 F.2d 521, 528 (6th Cir.1984), *cert. denied*, 469 U.S. 1158, 105 S.Ct. 906, 83 L.Ed.2d 921 (1985); *United States v. Thevis*, 665 F.2d 616, 640 n. 26 (5th Cir.1982).

The Third Circuit's concept of inherent judicial authority to grant immunity has not been widely accepted. However, several courts have indicated that the trial court might have the authority to force the prosecution to elect to confer immunity on a witness or face a judgment of acquittal if actions by the prosecution constitute a "deliberate distortion of the fact-finding process." *United States v. Hooks*, 848 F.2d 785, 802–03 (7th Cir.1988); *United States v. Lord*, 711 F.2d 887, 891–92 (9th Cir.1983); *United States v. Burns*, 684 F.2d 1066, 1077 (2d Cir.1982), *cert. denied*, 459 U.S. 1174, 103 S.Ct. 823, 74 L.Ed.2d 1019 (1983); *United States v. Lenz*, 616 F.2d 960, 962 (6th Cir.1980), *cert. denied*, 447 U.S. 929, 100 S.Ct. 3028, 65 L.Ed.2d 1124 (1980); *United States v. Klauber*, 611 F.2d 512, 518 (4th Cir.1979), *cert. denied*, 446 U.S. 908, 100 S.Ct. 1835, 64 L.Ed.2d 261 (1980); *Earl v. United States*, 361 F.2d 531, 534 n. 1 (D.C.Cir. 1966), *cert. denied*, 388 U.S. 921, 87 S.Ct. 2121, 18 L.Ed.2d 1370 (1967). *See also Smith*, 615 F.2d at 969; *United States v. Morrison*, 535 F.2d 223, 229 (3d Cir.1976). *Contra United States v. Payton*, 878 F.2d 1089, 1092 (8th Cir.1989), *cert. filed*, (Docket No. 89–5743, Oct. 5, 1989).

**3.** Alaska R.Crim.P. 43(c); Cal.Penal Code § 1385; Idaho R.Crim.P. 48(a)(2); Iowa R.Crim.P. 27(1); Minn.Stat. § 631.21; Mont. Code § 46–13–201; N.Y.Crim.Proc. § 210.40; Okla.Stat. tit. 22, § 815; Oregon Rev.Stat. § 135.755; Puerto Rico R.Crim.P. 247(b); Utah Code § 77–51–4; Vt.R.Crim.P. 48(b)(2); Wash. R.Crim.P. 8.3.

The New York statute, which explicitly sets forth criteria to be considered by the trial court, allows a motion to dismiss in the furtherance of justice to be made by the defendant as well as the prosecutor or the court. N.Y.Crim.Proc. § 210.40(2). *See generally Panibianci*, 510 N.Y. S.2d at 802–03.

which have often addressed the issue of defense witness immunity, have no similar express authority.[4]

A critical issue in this case is the extent of Judge Rowland's authority to dismiss under Rule 43(c). In *State v. Carlson*, 555 P.2d 269 (Alaska 1976), the defendant Vail and his codefendant Taylor were charged with murder. The prosecutor indicated he was willing to accept guilty pleas to manslaughter from both defendants but not from only one defendant. Vail was willing to plead guilty to manslaughter; Taylor was not. The trial judge indicated that he was willing to accept a plea to manslaughter from Vail even though Taylor was not also willing to plead guilty. In making this decision, the trial judge gave several reasons why accepting Vail's plea to manslaughter would be in the interest of justice. *Id.* at 270. The supreme court held that the trial judge did not have the authority under Criminal Rule 43(c) to enter into the plea bargaining process and entered a writ prohibiting the trial judge from reducing the charge against Vail from murder to manslaughter. *Id.* at 271–72.

In *State v. Jones*, 751 P.2d 1379 (Alaska App.1988), Jones was charged with manslaughter and two counts of assault in the second degree. The prosecutor telephoned Jones' attorney and informed the attorney that Jones' case would be dismissed. Jones' counsel told the prosecutor that he would notify Jones of the state's decision. On being informed by his counsel of the impending dismissal, Jones told his family and friends that his case was being dismissed. He also made travel plans based upon this information. However, the prosecutor's decision to dismiss the case was overridden by the chief prosecutor's office. *Id.* at 1380–81. Jones moved for an order enforcing the original promise to dismiss

the charges. At a hearing on the motion, Jones established that he had relied on the promise by the prosecution to dismiss the charges by informing family and friends of the dismissal and making travel plans. Jones maintained that he had suffered emotional distress as a result of the state's action. *Id.* at 1381. The trial judge concluded that the state was bound by its promise to dismiss. In dismissing the case, the trial judge reasoned that to not enforce the state's promise to dismiss would result in a loss of credibility in both the legal system and counsel. He concluded that this was an appropriate case to dismiss under Criminal Rule 43(c). *Id.* This court reversed. We held that since Jones had not suffered any significant disadvantage in attempting to defend against the charges, he had not suffered any legal prejudice. We concluded that the emotional distress which Jones suffered was not a sufficient reason to authorize the trial judge to dismiss the case in the interest of justice. *Id.* at 1382–83.

The Alaska cases therefore establish that there are limits on the trial judge's authority to dismiss under Criminal Rule 43(c). To try to determine the extent of the trial judge's authority, we have examined cases from other states which have statutes or rules similar to Criminal Rule 43(c). In particular, we have looked at cases from California, in part because the supreme court, in deciding *Carlson*, relied on a California case in concluding that Criminal Rule 43(c) did not authorize the trial judge to engage in plea bargaining.[5] 555 P.2d at 271–72. In *People v. Andrade*, 86 Cal. App.3d 963, 150 Cal.Rptr. 662, 670 (1978) (citation omitted), the court listed the following factors as being among those which a trial court should consider in determining

---

**4.** The Federal Rules Committee once proposed adding such language to Federal Rule of Criminal Procedure 48(b), but the proposal was never adopted. *See Preliminary Draft of Proposed Amendments to Rules of Criminal Procedure for the United States District Courts*, 48 F.R.D. 553, 640–41 (1970).

**5.** California's equivalent of Criminal Rule 43(c), Penal Code § 1385, provides that:

The judge or magistrate may, either of his or her own motion or upon the application of the prosecuting attorney, and in furtherance of justice, order an action to be dismissed. The reasons of the dismissal must be set forth in an order entered upon the minutes. No dismissal shall be made for any cause which would be ground of demurrer to the accusatory pleading.

whether to dismiss in the interest of justice:

> [T]he weight of the evidence indicative of guilt or innocence, the nature of the crime involved, whether the defendant is or has been incarcerated awaiting trial, or has been sentenced in a related or similar case, the length of such incarceration, the possibility of harassment, the likelihood of new or additional evidence at trial, the effect on the protection to society in case the defendant should actually be guilty, and the probability of greater incarceration upon conviction of the other offense.... This last item is perhaps another way of saying that the court should consider the possibility that the defendant will escape a proper punishment.

*See also State v. Brumage*, 435 N.W.2d 337, 340–41 (Iowa 1989).

In *People v. Borunda*, 11 Cal.3d 523, 113 Cal.Rptr. 825, 826–827, 522 P.2d 1, 2–3 (1974), the state refused to disclose the identity of an informant who the defendant demonstrated might be a material witness on a critical issue involving evidence of the defendant's guilt or innocence. The trial judge dismissed the case in the interest of justice, and the California Supreme Court upheld the dismissal. *Id.*

In *People v. Mejia*, 57 Cal.App.3d 574, 129 Cal.Rptr. 192 (1976),[6] police arrested seven people including the defendant and two illegal aliens who were present in a house where the police found 130 kilos of marijuana in a bedroom closet. At the time of the arrest, Mejia stated, "It's mine, all mine. No one else knows anything about it." *Id.*, 129 Cal.Rptr. at 195. At the time of the arrest, Mejia had $2,000 in United States currency in his hand. The state charged Mejia and his wife with possession of marijuana for sale. The five other adults who were arrested were not prosecuted. The state turned the two illegal aliens over to the United States Immigration Service for deportation almost immediately after the arrest. Mejia moved to compel the state to produce the two illegal aliens as material witnesses, or, in the alternative, to dismiss the case. The state offered to provide Mejia with the witnesses' addresses in Mexico. *Id.* The trial court found that the two illegal aliens were material witnesses who could provide potentially exculpatory testimony and that by turning them over to the United States Immigration Service, the state had made them unavailable. The California Court of Appeals upheld the dismissal in the interest of justice. *Id.*, 129 Cal.Rptr. at 195–98.

These two California cases establish the authority of the court to dismiss cases in the interest of justice where the state either refuses to disclose the identity of a material witness or the state's actions result in the unavailability of a witness. New York courts have extended this principle to at least some cases where a material defense witness refuses to testify without immunity because of fear of a subsequent perjury prosecution. *See generally* Note, *Defense Witness Immunity in New York*, 71 Cornell L.Rev. 890 (1986). Significantly, the potential impact of an immunity grant in New York is much greater than in Alaska because of that state's statutory adoption of the requirement that a witness must receive "transactional" immunity before he can be compelled to testify. N.Y.Crim. Proc. § 50.10(1).

The leading case in New York is *People v. Shapiro*, 431 N.Y.S.2d 422, 409 N.E.2d 897 (1980). Although not expressly decided under New York Criminal Procedure Law § 210.40, which empowers New York courts to dismiss an indictment in the furtherance of justice, the controlling principles are similar. Shapiro was convicted for promoting prostitution, endangering the welfare of a minor, and sodomy. 431 N.Y. S.2d at 423, 409 N.E.2d at 899. Two men, Shomer and Senn, brought two boys, Gary F. and Duane S., to Shapiro's residence for the purpose of engaging in sexual acts for hire; another adult, Dowling, was also a

---

6. *Mejia's* standard of materiality was abrogated by California's Proposition 8 in favor of the federal standard. *See People v. Valencia*, 218 Cal.App.3d 808, 267 Cal.Rptr. 257 (1990). How- ever, the changes made by Proposition 8 do not affect *Mejia* as we have characterized it for the present case.

participant. *Id.*, 431 N.Y.S.2d at 427, 409 N.E.2d at 903. Duane S. testified that Shomer and Senn had driven him to Shapiro's residence for that purpose and that Shapiro had engaged in anal intercourse with him. *Id.* Shapiro defended on the theory that he was "a man whose uncontrollable sexual urges made him the easy dupe of Shomer and Senn, the real and sole promoters, who manipulated Shapiro so they could stage their activities in his home." *Id.* Accordingly, Shapiro proposed calling Gary F., Shomer, and Dowling as defense witnesses (Senn was confined to a mental institution and unavailable to either side). *Id.*, 431 N.Y.S.2d at 428 & n. 4, 409 N.E.2d at 903 & n. 4. All three had testified in prior proceedings and invoked their privilege against self-incrimination for fear "that any testimony they would give on behalf of Shapiro would precipitate their prosecution for perjury." *Id.*, 431 N.Y.S.2d at 428, 409 N.E.2d at 903. The prosecutor demanded "unswerving and unconditional adherence to their prior testimony," refusing to grant immunity and admonishing the witnesses that, by testifying differently than they had previously, they would be subjecting themselves to prosecution for perjury. *Id.*, 431 N.Y.S.2d at 428, 409 N.E.2d at 903.

The New York Court of Appeals recognized that the witnesses' assertions of privilege were well-founded, that the exercise of constitutional privilege may sometimes conflict with a defendant's right to a fair trial and compulsory process, and that the power to confer immunity rests in the discretion of the prosecutor. *Id.*, 431 N.Y. S.2d at 428, 409 N.E.2d at 904. The court also pointed out that immunity would not protect the witnesses from perjury prosecution if they testified falsely at trial. *Id.*, 431 N.Y.S.2d at 428–30, 409 N.E.2d at 904–05. The court concluded that "the District Attorney's refusal to extend immunity, not to speak of the menacing terms in which he did so, could have served no other purpose than to irretrievably bind the witnesses to their previous sworn versions, accurate or not." *Id.*, 431 N.Y.S.2d at 429, 409 N.E.2d at 905. The court conditioned retrial on the defendant's witnesses being granted immunity as a condition for a new trial. *Id.*, 431 N.Y.S.2d at 430, 409 N.E.2d at 906.

A similar case is *People v. Priester*, 98 A.D.2d 820, 470 N.Y.S.2d 478 (1983). A critical issue in dispute was whether Priester, who was on trial for second degree murder, had acted intentionally or in self-defense. The People presented a witness who testified that Priester stated that he was "going to get his gun" after an earlier altercation with the victim, but the witness later indicated that she wished to recant her testimony, claiming that she did not know whether Priester or someone else had made the statement. After being assigned counsel and advised of possible perjury charges, the witness asserted her fifth amendment rights, and the district attorney refused to grant immunity. In his summation, the district attorney relied heavily upon the testimony as bearing on Priester's intent. *Id.*, 470 N.Y.S.2d at 479. Likening Priester's case to *Shapiro*, where "the District Attorney's denial of immunity had the effect of binding this witness to her previous testimony which she contended was not accurate" and the immunity sought was strictly for past perjury, the appellate division held that Priester could only be retried if the witness were granted immunity. *Id.*, 470 N.Y.S.2d at 480.

Under the unusual circumstances of the case at bar, we conclude that the trial court did not abuse its discretion in ordering a dismissal in the interest of justice. First, the evidence that Melvin Echols sexually abused W.E. was problematic. At trial, W.E. testified that Echols had not sexually abused her. She testified that she and R.E. had invented the charges of sexual abuse so that W.E. could be placed in a foster home. At trial, the state was attempting to secure a conviction based upon W.E.'s prior inconsistent statements. Under either the state's or Melvin Echols' version of the facts, R.E. was a critical witness. She could either corroborate Melvin Echols' history of abuse of his children or testify that she had conspired with W.E. to make false charges and was now attempting to withdraw those charges. R.E. was apparently available as a witness if

she had been given use immunity for her testimony at trial. Judge Rowland concluded that the jury should hear R.E.'s testimony. He concluded that it would be fundamentally unfair if Melvin Echols were convicted of the charges involving W.E. if the jury did not hear from this critical witness.

Other factors enter into the equation. In its opening statement, the state had extensively discussed R.E.'s anticipated testimony. Furthermore, even if the court dismissed the charges involving W.E., Melvin Echols still faced the charges involving his abuse of T.E. T.E. testified about those charges, implicating Melvin Echols. Therefore, the state's case involving T.E. was much stronger, and less problematic. Melvin Echols was ultimately convicted of those charges.

The state argues that granting R.E. immunity would have created severe problems for the state. However, we conclude that Judge Rowland did not err in finding that the state did not substantiate this claim. R.E. was not a codefendant with Melvin Echols; she was not charged or implicated in any of the assaults involving T.E. or W.E. The charges against R.E. involved perjury and witness tampering. The state's theory of the case was that R.E. did not want to see her father prosecuted, and had lied to protect him and had threatened T.E. The state had already obtained indictments on these charges and had apparently secured evidence to draft indictments for five more charges resulting from the recently discovered perjury. In addition, if the state believed that R.E. perjured herself in testimony at Echols' trial, it would not have been precluded from prosecuting her notwithstanding a grant of immunity under the terms of AS 12.50.101(a). It is difficult to see how the state would have been substantially prejudiced in pursuing those charges by merely giving R.E. use immunity for her testimony during Melvin Echols' trial. This conclusion is bolstered by the fact that the state offered to grant R.E. use immunity for her testimony at an evidentiary hearing. The state's interest in prosecuting Melvin Echols without R.E.'s testimony because it believed she might testify falsely does not require a reversal of Judge Rowland's ruling. As the judge pointed out, it was for the jury to make the factual and credibility determinations in the case. *See Brown v. Anchorage*, 680 P.2d 100, 104 (Alaska App. 1984). By testifying without immunity, R.E., like the witnesses in *Shapiro*, would have been forced to testify to a version of facts, whether true or not, to avoid prosecution for perjury.

Given this set of circumstances, we conclude that Judge Rowland did not abuse his discretion in ruling that the interest of justice required the jury to hear from R.E. before deciding the guilt or innocence of Melvin Echols on the charges that he had sexually abused W.E. We accordingly AFFIRM the trial court's decision.

BRYNER, Chief Judge, with whom SINGLETON, J., joins, concurring.

I agree with the majority opinion's basic rationale in affirming the superior court's dismissal order. However, I am concerned that the opinion may be misleading in the undue prominence it gives to decisions that dwell on whether and to what extent a court has the power to direct the prosecution to confer immunity on potential defense witnesses.

The state has mistakenly attempted to characterize the central issue in this case as whether Judge Rowland had the inherent power to order the state to immunize R.E. In support of its contention that Judge Rowland did not have such power, the state marshals strong, if not compelling, authority for the proposition that decisions involving witness immunity lie within the exclusive province of the executive branch of government. In comparison, the case law to the contrary—which the majority opinion discusses at length and relies on unnecessarily—appears to be relatively unconvincing and of questionable validity.

For purposes of deciding this case, however, I think we may assume that there is no inherent judicial authority to immunize a potential defense witness, to direct the state to confer immunity, or to order dis-

missal as a sanction for the state's failure to do so.

Judge Rowland did not purport to have inherent authority to immunize R.E. To the contrary, he apparently assumed that he had no such authority. Likewise, Judge Rowland never directed the state to grant immunity to R.E. and said nothing to support the conclusion that he believed himself empowered to command the state to do so. Furthermore, at no point did Judge Rowland say anything to indicate that he dismissed Echols' charges in order to sanction the state for wrongfully refusing to grant immunity. In context, then, the question of judicial authority to compel immunity for defense witnesses is a red herring.[1]

The simple and exclusive basis for Judge Rowland's dismissal order was his conclusion that, under the unique circumstances of the present case, it would have been fundamentally unfair to subject Echols to the possibility of conviction on the disputed charges given the absence of R.E.'s exculpatory testimony. Thus, the only question

that need be decided here is whether Judge Rowland abused his discretion in concluding, under Criminal Rule 43(c), that dismissal was necessary in furtherance of justice.[2]

The state gives only cursory attention to this issue in its briefs. Relying primarily on *State v. Carlson*, 555 P.2d 269 (Alaska 1976), and *State v. Jones*, 751 P.2d 1379 (Alaska App.1988), the state describes the court's power to dismiss in furtherance of justice as "extremely limited" and puts forth the conclusory assertion that Judge Rowland abused his discretion in exercising his authority under Rule 43(c) in this case.

This court has previously indicated that, while authority to dismiss in furtherance of justice is not unlimited, "Criminal Rule 43 vests the trial court with broad discretion to dismiss...." *Jones*, 751 P.2d at 1382. The decisions of this court and the supreme court have restricted trial court discretion to dismiss under Rule 43(c) in only two types of situations, neither of which is apposite here.

---

**1.** Judge Rowland was, of course, aware that the prejudice stemming from R.E.'s unavailability would have been cured had the state elected to grant her immunity. Accordingly, the judge appropriately refrained from ordering dismissal until the state had made its final decision not to grant immunity. In the absence of some action to compel the state to confer immunity or some indication that the dismissal amounted to a sanction for the state's wrongful withholding of immunity, Judge Rowland's recognition that, as a practical matter, the state had the authority to make R.E. available did not amount to a judicial incursion into executive branch powers.

**2.** Alaska Criminal Rule 43(c) provides:

> (c) *In Furtherance of Justice.* The court may, either on its own motion or upon the application of the prosecuting attorney, and in furtherance of justice, order an action, after indictment or waiver of indictment, to be dismissed. The reasons for the dismissal shall be set forth in the order.

Alaska Criminal Rule 43(c) was apparently adopted by the Alaska Supreme Court from former ACLA, Code of Criminal Procedure § 66–18–16 (1948) which was in turn derived without change from CLA, Code of Criminal Procedure § 5443 (1933); CLA Code of Criminal Procedure § 2370 (1913); and The Laws of Alaska, Code of Criminal Procedure § 261 (T. Carter ed. 1900). The Alaska code is derived, in part, from the pre–1900 laws of Oregon and New

York. *See Andreanoff v. State*, 746 P.2d 473, 475 n. 2 (Alaska App.1987). The Oregon predecessor was Oregon Laws § 323, October 19, 1864, as recorded in Hills Annotated Laws of Oregon, Criminal Procedure § 1527 (2d ed. 1892). The current statute, Oregon Revised Statute § 135.755 (1989), mirrors Alaska Criminal Rule 43(c).

Under federal law, there is no provision comparable to Alaska Criminal Rule 43(c) authorizing dismissal in furtherance of justice. Consequently, federal courts exercise an extremely restricted range of implied supervisory authority and do not recognize any inherent power to dismiss in furtherance of justice. *See, e.g., United States v. Chanen*, 549 F.2d 1306, 1309 (9th Cir.1977). The federal cases dealing with compelled witness immunity must be understood in this context. When potential defense witnesses refuse to provide exculpatory testimony, federal courts, because they lack authority to dismiss in furtherance of justice, are empowered to dismiss, or to threaten to dismiss, only if they are willing to assume the existence of some inherent power to order immunity or some prosecutorial duty to confer immunity. The question of inherent judicial authority to require immunity is one which, in turn, poses substantial separation of powers problems. Because Alaska Criminal Rule 43(c), affirmatively grants authority to dismiss in furtherance of justice, no separation of powers problems arise. *See, e.g., State v. Sonneland*, 80 Wash.2d 343, 494 P.2d 469, 473 (1972).

In *Carlson*, 555 P.2d at 271–72, the Alaska Supreme Court held that the superior court's authority to dismiss in furtherance of justice under Rule 43(c) did not empower the court to engage in charge bargaining with the defendant, over the objections of the state. *Carlson* is in keeping with similar decisions reached in other jurisdictions. *See, e.g., People v. Orin*, 13 Cal.3d 937, 120 Cal.Rptr. 65, 71–72, 533 P.2d 193, 199–200 (1975); *People v. Panibianci*, 134 Misc.2d 274, 510 N.Y.S.2d 801, 803 (Sup.1986); *State ex rel. Powell v. Shi*, 566 P.2d 1170, 1171–72 (Ok.Crim.App.1977). To similar effect are cases which conclude that the power to dismiss in furtherance of justice does not allow a court to invade the prosecution's traditionally exclusive authority to determine which charges to bring and how to allocate its resources. *See, e.g., People v. Andrade*, 86 Cal.App.3d 963, 150 Cal. Rptr. 662, 669 (1978); *State v. Fleck*, 269 N.W.2d 736, 737 (Minn.1978); *State v. Wilke*, 28 Wash.App. 590, 624 P.2d 1176, 1179 (1981).

In *Jones*, 751 P.2d at 1382, this court held that dismissal in furtherance of justice under Rule 43(c) was impermissible when ordered in response to state action that did not result in actual prejudice to the defendant. Again, this holding accords with case law from other jurisdictions indicating that the power to dismiss in furtherance of justice is meant to be used on a case-by-case basis as a remedy for actual unfairness suffered by the accused. *See, e.g., People v. Peinado*, 67 Cal.App.3d Supp. 1, 136 Cal.Rptr. 845, 850 (1976); *State v. Shepherd*, 21 Or.App. 52, 533 P.2d 353, 354–55 (1975); *City of Seattle v. Orwick*, 113 Wash.2d 823, 784 P.2d 161, 165 (1989); *State v. Cochran*, 51 Wash.App. 116, 751 P.2d 1194, 1198 (1988); *State v. Long*, 32 Wash.App. 732, 649 P.2d 845, 847 (1982).

Nothing in these cases suggests, however, that discretion to dismiss in furtherance of justice under Rule 43(c) must be restricted as a matter of law when, as in this case, the judge concludes in the course of trial that a conviction would be fundamentally unfair because of the unavailability of crucial exculpatory evidence. The issue presented is thus whether, under the totality of the circumstances, Judge Rowland abused his broad discretion in deciding to dismiss the disputed charges.

Judge Rowland expressly found R.E.'s proposed testimony to be of crucial exculpatory value, a finding that appears to be amply supported by the record.[3] A strong argument could be made that a dismissal under Rule 43(c) would not have been justified absent some state participation in R.E.'s unavailability. *See, e.g., People v. Mejia*, 57 Cal.App.3d 574, 129 Cal.Rptr. 192, 197 (1976); *State v. Adams*, 86 Or. App. 139, 738 P.2d 988, 991 (1987); *State v. Dailey*, 93 Wash.2d 454, 610 P.2d 357, 359 (1980). Here, however, the state was inextricably involved in the circumstances that led R.E. to invoke her privilege not to testify. Indeed, the record establishes that the prosecution consistently did everything in its power to avail itself of R.E.'s testimony when it appeared likely to be favorable and to assure that the testimony would not be heard when it appeared likely to be unfavorable. Given the extent of the state's involvement in this case, it was not necessary for Judge Rowland to find that the state's actions were "evil, venal or dishonest." *Cochran*, 751 P.2d at 1198. *See also Mejia*, 129 Cal.Rptr. at 196–97.

It is also arguable that dismissal under Rule 43(c) would have amounted to an abuse of discretion if the prejudice to Echols could have been cured by some lesser measure, such as a mistrial. *See, e.g.,*

---

**3.** The state challenges Judge Rowland's assessment of the importance of this evidence, arguing that R.E. would not have been of material exculpatory value because she would have testified only as to W.E.'s credibility. This argument is specious because it ignores the distinction between general credibility and specific evidence of falsehood. At trial, W.E. denied being abused by Echols and testified that she had fabricated her prior claims of abuse. Proof of

Echols' guilt depended primarily on W.E.'s prior statements. R.E., while not a witness to the alleged abuse, was a direct witness (and, indeed, by her own account and that of W.E., an instigator) of the purportedly falsified charges that W.E. originally made. R.E.'s confirmation of W.E.'s trial testimony could thus have been of crucial value to the jury. Judge Rowland did not abuse his discretion in so finding.

**1078**

*Peinado,* 136 Cal.Rptr. at 850–51; *State v. Laureano,* 101 Wash.2d 745, 682 P.2d 889, 900 (1984); *Dailey,* 610 P.2d at 360; *State v. Burri,* 550 P.2d 507, 513 (Wash.1976). Given the apparent finality of the state's decision not to confer immunity on R.E., however, Judge Rowland had no reason to believe that the unfairness stemming from her unavailability would be cured upon retrial if a mistrial were granted.

In short, considering the totality of the circumstances in the present case, there appears to be no basis for concluding that Judge Rowland abused his discretion in ordering dismissal in furtherance of justice under Alaska Criminal Rule 43(c). To the extent that this conclusion represents the core holding of the majority opinion, I agree with it.

