**Jerry Dwight COGDILL, Appellant,**

v.

**STATE of Alaska, Appellee.**

No. A–8541.

Court of Appeals of Alaska.

Nov. 19, 2004.

David D. Reineke, Assistant Public Defender, and Barbara K. Brink, Public Defender, Anchorage, for the Appellant.

W.H. Hawley Jr., Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Gregg D. Renkes, Attorney General, Juneau, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

*OPINION*

MANNHEIMER, Judge.

Jerry Dwight Cogdill appeals his conviction for bootlegging—selling alcoholic beverages without a license—in a "local option"

community (*i.e.*, a community that has voted to restrict the sale and/or possession of alcoholic beverages under AS 04.11.491).[1] Cogdill claims that the superior court was obliged to dismiss the prosecution pursuant to Criminal Rule 43(c) because the district attorney's office refused to grant immunity to a potential witness who asserted her privilege against self-incrimination and declined to testify.

For the reasons explained here, we conclude that (1) this witness's testimony was not essential to a fair trial, and (2) the State had a good reason not to grant immunity to the witness. Accordingly, the superior court correctly refused to dismiss the case against Cogdill.

*Underlying facts*

Cogdill was a bootlegger who was caught in a "sting" operation. The police had information that Cogdill was selling alcoholic beverages, but the police were also told that Cogdill would not sell directly to prospective customers; instead, Cogdill insisted on selling the liquor only through a go-between, Eleanor Merly. For this reason, police informant Bertha Leavitt approached Merly. Leavitt asked Merly to obtain a bottle of liquor for her, and Merly (who was ignorant of the police investigation) agreed.

The police gave Leavitt a marked $100 bill to use as the purchase money. Then, under police surveillance, Leavitt took a cab to Cogdill's residence. When the cab arrived at Cogdill's residence, Leavitt handed the $100 bill to Merly. Merly went inside while Leavitt waited in the cab. A little later, Merly emerged from the residence with a bottle of vodka; she gave this bottle to Leavitt.

Leavitt turned the bottle of vodka over to the police, and the police then obtained a search warrant for Cogdill's residence. During the ensuing search, the police found the marked $100 bill that Leavitt had given Merly, as well as other bottles of vodka. Under questioning by the police, Cogdill admitted that he had just sold a bottle of vodka to

Merly. Based on this evidence, Cogdill was charged with felony bootlegging.

*The controversy surrounding Merly's proposed testimony*

Merly was not charged with any crime, even though the evidence suggested that Merly potentially faced criminal liability for her role in this transaction.[2]

Prior to trial, a defense investigator interviewed Merly. During this interview, Merly denied that Cogdill had sold the bottle of vodka. Merly conceded that she had given Cogdill the $100 bill, but she asserted that she gave him this money in order to pay off a pre-existing debt. As to how Merly happened to leave Cogdill's residence carrying a bottle of vodka, Merly explained that Cogdill had agreed to loan her a bottle of vodka, with the understanding that she would replenish Cogdill's supply when she got her own next shipment of liquor.

(In other words, Merly asserted that she had embezzled Leavitt's money. Instead of using the $100 to purchase alcohol (the purpose for which Leavitt had entrusted the money to Merly), Merly used the money to pay off her own pre-existing debt to Cogdill. Then, in order to conceal this embezzlement from Leavitt, Merly borrowed a bottle of vodka from Cogdill and gave the bottle to Leavitt. Thus, according to Merly's description of these two transactions, she (Merly) was the person who ultimately was going to pay for the bottle of vodka that she delivered to Leavitt.)

Cogdill's attorney wanted Merly to take the stand and give this account of events, but Merly invoked her privilege against self-incrimination.

Cogdill's attorney then suggested that, because Merly was unavailable as a witness, her statement was admissible under Evidence Rule 804(b)(3) as a statement against penal interest. But under Rule 804(b)(3), when "a statement tending to [incriminate] the declarant [is] offered to exculpate the accused", the statement is not admissible "unless corroborating circumstances clearly

---

1. AS 04.11.010(a); AS 04.16.200(b).

2. See the cases discussed in *State v. Burden,* 948 P.2d 991, 993 (Alaska App.1997).

indicate the trustworthiness of the statement". Superior Court Judge Michael I. Jeffery ruled that Merly's statement did not have sufficient guarantees of trustworthiness to satisfy Rule 804(b)(3). Cogdill does not challenge this ruling.

In a final attempt to have Merly's version of events presented to the jury, Cogdill's attorney argued that Merly's proposed testimony was essential to a fair trial, and that the State should therefore grant Merly immunity for her testimony. Relying on this Court's decision in *State v. Echols*[3] (which we discuss at length later in this opinion), Cogdill argued that if the State declined to immunize Merly, Judge Jeffery should exercise his authority under Alaska Criminal Rule 43(c) and dismiss the prosecution "in furtherance of justice".

Judge Jeffery concluded that Cogdill's case was materially different from the situation presented in *Echols*, and he therefore refused to order the State to immunize Merly or face dismissal of the indictment.

This is the ruling that Cogdill challenges on appeal. Cogdill argues that Judge Jeffery abused his discretion when he declined to dismiss the case after the State refused to grant immunity to Merly.

*Why we affirm the superior court's ruling*

In *State v. Echols*, this Court recognized that there are certain extreme circumstances in which a trial judge can properly dismiss a criminal prosecution under Criminal Rule 43(c) if the State refuses to immunize a witness who has crucial exculpatory evidence to offer.[4] However, *Echols* provides uncertain guidance concerning the precise circumstances that warrant this type of judicial intervention.

The lead opinion in *Echols* lists several factors that, in combination, were found to justify the trial judge's decision to dismiss the prosecution: (1) the State's evidence

against the defendant was ambiguous and uncertain;[5] (2) the witness who was claiming the Fifth Amendment privilege could be expected to provide critical testimony regarding the defendant's guilt or innocence;[6] (3) the State had no significant reason for refusing to grant immunity to this witness;[7] and (4) the State would still have been able to prosecute the witness, even if the witness received immunity.[8]

(This last factor deserves special attention. At the time *Echols* was decided, a witness's privilege against self-incrimination could be overridden by a grant of use immunity. *See* AS 12.55.101(a). Thus, even though the immunized witness would be protected from the government's later use of their testimony, and from the use of any information derived from that testimony, the government would still be able to prosecute the witness for crimes arising from the events described in the witness's testimony if the government's case was based on pre-existing or independently derived evidence.

Although AS 12.55.101(a) is still on the books, that use immunity statute has been superseded by the Alaska Supreme Court's decision in *State v. Gonzalez*, 853 P.2d 526 (Alaska 1993). In *Gonzalez*, the supreme court held that, under the Alaska Constitution, use immunity is not an adequate substitute for a witness's privilege against self-incrimination; instead, a witness must receive transactional immunity before the government can require the witness to give self-incriminating testimony.[9] To date, this Court has not addressed the question of whether *Echols* retains the same vitality now that any grant of immunity will categorically preclude the State from prosecuting the immunized witness for any crimes arising from the transaction that the witness is forced to testify about.)

The "totality of the circumstances" approach adopted by the lead opinion in *Echols* is undercut to a certain extent by the fact

---

3.  793 P.2d 1066 (Alaska App.1990).

4.  *Echols*, 793 P.2d at 1072–75.

5.  *Id.* at 1074–75.

6.  *Id.* at 1074.

7.  *Id.* at 1075.

8.  *Id.*

9.  *Gonzalez*, 853 P.2d at 530–32.

that two members of the court (*i.e.*, a majority) wrote separately to give their own rationale for the decision. In a concurring opinion, Judges Bryner and Singleton stated that, in their view, "[t]he simple and exclusive basis" for the dismissal of the prosecution was that "under the unique circumstances of the ... case, it would have been fundamentally unfair to subject [the defendant] to the possibility of conviction on the disputed charges [in] the absence of [the witness's] exculpatory testimony".[10]

According to these two concurring judges, the trial judge's decision to dismiss the prosecution was justified by two factors: (1) the absent witness's testimony had "crucial exculpatory value",[11] and (2) the district attorney's office "was inextricably involved in the circumstances that led [this witness] to invoke her privilege not to testify".[12] "Indeed", the two concurring judges declared,

> the record establishes that the [State] did everything in its power to avail itself of [this witness's] testimony when it appeared likely [that the testimony would] be favorable [to the State,] and [did everything in its power] to assure that the testimony would not be heard when it appeared likely [that the testimony would] be unfavorable [to the State].

*Echols,* 793 P.2d at 1077 (Bryner, C.J., and Singleton, J., concurring).

Thus, even though the lead opinion in *Echols* is grounded on a "totality of circumstances approach", the two concurring judges appear to have reached their decision on the basis that the State engaged in unfair manipulation of the evidentiary process: threatening prosecution of a crucial defense witness when the State's sole motive for this threat was to deter the witness from testifying for the defense.

We have never been called upon to resolve the potential differences between these two approaches. In our one published case construing *Echols,* we noted merely that the

*Echols* decision "applies only to a narrow set of circumstances: instances where the State's refusal to grant immunity to a defense witness undermines the fundamental fairness of the trial." *Blair v. State,* 42 P.3d 1152, 1155 (Alaska App.2002).

In *Blair,* the defendant was charged with assaulting his wife.[13] In advance of trial, Blair's wife indicated that she wished to recant her accusation of assault. But rather than testify at her husband's trial, she asserted her privilege against self-incrimination (apparently out of concern that she might be charged with making a false report or with having committed perjury at an earlier court hearing).[14] When the State declined to grant immunity to Blair's wife, Blair asked the trial judge to dismiss the case under Criminal Rule 43(c). The judge refused to dismiss the prosecution, and we upheld the judge's decision on appeal.

In *Blair,* we gave two reasons for upholding the trial judge's decision. First, we concluded that the absence of the wife's testimony "did not undermine the fairness of Blair's trial" because "[i]t was not manifest that Blair's wife's testimony would have led to his acquittal":[15]

> Blair's case presented an instance where the purported victim of domestic violence indicated her desire to retract her earlier accusation. Assuming that Blair's wife would have recanted her prior accusation against her husband, she would certainly have been impeached with her prior claims that she had been assaulted.

*Blair,* 42 P.3d at 1155.

Second, we noted that the State had a valid reason for declining to grant immunity to Blair's wife:

> [T]he government has a strong interest in not granting immunity to spouses and live-in companions who later claim that their initial accusations of domestic violence were false. Freely granting immunity to recanting victims in domestic violence

---

10. *Echols,* 793 P.2d at 1076.

11. *Id.* at 1077.

12. *Id.*

13. *Blair,* 42 P.3d at 1153.

14. *Id.* at 1155.

15. *Id.*

cases would likely engender collusion and witness-tampering.

*Blair,* 42 P.3d at 1155–56.

We uphold Judge Jeffery's decision in Cogdill's case for both of these same reasons.

First, Cogdill has failed to show that the absence of Eleanor Merly's proposed testimony undermined the fundamental fairness of his trial. Even though Merly was apparently willing to give a version of events that exculpated Cogdill, it was not manifest that Merly's proposed testimony would have led to Cogdill's acquittal. Given the circumstances of this case—particularly, given the fact that Cogdill ended up with the marked $100 bill, and that he confessed to selling the bottle of vodka when he was interviewed by the police—Merly's proposed testimony does not appear to have been crucial, verdict-altering evidence. We further note that Cogdill does not challenge Judge Jeffery's ruling that Merly's out-of-court statements did not carry sufficient guarantees of trustworthiness to merit admission under Evidence Rule 804(b)(3).

Second, the State had a valid reason for declining to grant immunity to Merly. Given the evidence in this case, the district attorney could reasonably conclude that Merly was an accomplice to Cogdill's bootlegging operation. It is true that the district attorney apparently decided not to charge Merly for her role in the bootlegging scheme. Nevertheless, in situations where an apparent accomplice to a criminal scheme indicates a desire to absolve other participants in the scheme, freely granting immunity would likely engender collusion and witness-tampering.

Finally, if—as suggested by the concurring judges in *Echols*—the test is whether the State "was inextricably involved in the circumstances that led [the witness] to invoke her privilege not to testify",[16] there is no evidence of this in Cogdill's case. The record does not show that Merly belatedly chose to invoke her privilege against self-incrimination in response to overt threats by the State. Rather, Merly's invocation of her privilege could reasonably be anticipated, because the content of her proposed testimony was obviously self-incriminatory.

Nothing in the record suggests the type of prosecutorial manipulation present in *Echols*—where, according to the concurring judges, the State encouraged the witness to testify when it appeared that the witness's testimony would favor the State, and then started doing everything in its power (including threatening the witness with prosecution) "to assure that the [witness's] testimony would not be heard when it appeared likely [that this testimony would] be unfavorable [to the State]".[17]

For these reasons, we conclude that Judge Jeffery properly refused to dismiss the prosecution against Cogdill under Criminal Rule 43(c).

*Conclusion*

The judgement of the superior court is AFFIRMED.

---

16. *Echols,* 793 P.2d at 1077.

17. *Id.*