Richard C. BRANDON, Appellant,

v.

STATE of Alaska, Appellee.

Nos. A–3721, A–3722.

Court of Appeals of Alaska.

Oct. 2, 1992.

Rehearing Denied Oct. 29, 1992.

John Murtagh, Anchorage, for appellant.

Kenneth M. Rosenstein, Asst. Atty. Gen., Office of Special Prosecutions and Appeals, Anchorage, Charles E. Cole, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., COATS, J., and ANDREWS, Superior Court Judge.*

## OPINION

COATS, Judge.

A jury convicted Richard C. Brandon of two counts of assault in the first degree, a class A felony, and one count of kidnapping, an unclassified felony. AS 11.41.-200(a)(1), (a)(2); AS 11.41.300(a)(1)(C). This court reversed the conviction. *Brandon v. State*, 778 P.2d 221 (Alaska App.1989). On retrial, the jury again convicted Brandon of first-degree assault and kidnapping. Brandon brings this appeal, raising several issues. We affirm.

* Sitting by assignment made pursuant to article

At around 11:45 a.m. on March 7, 1987, Anchorage Police Officer William Thompson was dispatched to an apartment in response to a "911" telephone call. Thompson testified that a man in a bathrobe at that address identified himself as Richard Brandon and told Thompson Brandon's birth date and Social Security number. Thompson explained to Brandon that a 911 telephone call had been made from that location and been disconnected, and Brandon stated that his young son had possibly been playing with the phone. Thompson testified that a small boy standing in the doorway appeared to have been crying. Brandon assured Thompson that nothing was wrong. Thompson saw a woman in the apartment standing partially behind some drapes; the woman told Thompson that everything was all right.

At about 6:30 p.m. that same day, J.B. arrived at an Abused Women's Aid in Crisis (AWAIC) shelter. Intake counselor Kay White testified that J.B., who had an infant with her and appeared to be severely battered, requested shelter for the evening. J.B. told White that she had been beaten "all day" by her husband, Richard Brandon. J.B. said that she had tried to call 911 during the beating, but Brandon had pulled the phone from the wall. J.B. stated that her two children, the infant and her three-year-old son, had been present during the beating and that she was only able to leave the apartment when Brandon took the three-year-old to McDonald's. Concerned that J.B.'s injuries might be fatal, White told J.B. that J.B. would need to see a doctor before she could be admitted to the shelter. White drove J.B. to Humana Hospital, where she was examined by nurses and doctors and interviewed by the police. Doctor David Claman described J.B.'s injuries and testified that such a beating entailed a significant risk of death, and emergency room nurse Linda Kile testified that she had never seen anyone else with the same magnitude of injuries as J.B.

Officer Kathy Brewster went to the hospital and obtained J.B.'s signature consenting to a police entry into her home to

IV, section 16 of the Alaska Constitution.

search for and retrieve specifically listed items evidencing J.B.'s beating. Other police officers went to the Brandon residence at approximately 11:15 that night. When the police officers arrived at the residence, Brandon and his son, R.B., were present. Officer John Daily testified that Brandon told him that he had been sleeping until 2:00 that afternoon, that he thought J.B.'s boyfriend must have beaten her up, and that J.B. had later disappeared while Brandon was away from the apartment. Brandon was then arrested and taken before a magistrate. Brandon told Magistrate Roy V. Williams at a bail hearing in the early hours of March 8 that when "my wife came in this afternoon she was already beaten" by J.B.'s lover, a G.L., who lived about a block away. Sergeant William Gifford testified that, while the police were searching the apartment for the evidence that J.B. had been beaten, R.B. picked up a broom handle and said, "This is what daddy spanked mommy with." Officer Brewster testified that R.B. also told her that he had seen his father beat his mother with his father's belt.

The grand jury convened on March 24, 1987. At grand jury J.B. testified that, although she had told the AWAIC counselor and others that Brandon had beaten her, she had in fact been beaten by her lover, G.L. J.B. testified that Brandon and R.B. had left the apartment around 8:00 or 8:30 on the morning of March 7 and that G.L. had arrived shortly afterwards. She testified that G.L., who had been drinking, kicked and beat her with his hands and with Brandon's belt for several hours, and that it was G.L. who disabled the telephone when J.B. tried to call 911. She stated G.L. eventually left the apartment, and Brandon returned at about 11:30 a.m. J.B. testified to the grand jury that Brandon had wanted to report the assault immediately but that J.B., embarrassed about the love affair, asked him not to; when Officer Thompson arrived in response to the aborted 911 call, Brandon told Thompson that everything was all right only at J.B.'s request. J.B. testified that she later went to the AWAIC

shelter to avoid discussing her extramarital affair with Brandon, and that she told the AWAIC counselor that Brandon had beaten her because she was ashamed of her love affair and because she was unsure AWAIC would shelter her unless she implicated her husband. The prosecutor presented to the grand jury testimony from White and several other witnesses reporting J.B.'s prior inconsistent statements that Brandon had beaten her. The grand jury indicted Brandon.

Brandon's first trial ended in a mistrial. At the retrial the jury found Brandon guilty; this court reversed the conviction, holding that, while J.B.'s hearsay statements to White that Brandon had beaten her were admissible as excited utterances, J.B.'s statements to others and R.B.'s statements were inadmissible hearsay. *Brandon*, 778 P.2d at 225–27.

Following the reversal, the state retried Brandon. At the retrial R.B. testified that he had seen Brandon "hurt" and "hit" J.B. in the living room and that was why J.B. had been in the hospital. However, R.B. was unsure whether he had told the police that Brandon had beaten J.B. The police officers then testified to R.B.'s prior inconsistent statements. J.B. did not testify at the third trial. However, during opening statement Brandon read the jury J.B.'s grand jury testimony in which she accused G.L. of being the person who beat her.[1] Following the evidence, the jury convicted Brandon of first-degree assault and kidnapping. Brandon now appeals from this conviction.

## THE SEARCH OF BRANDON'S RESIDENCE

In *Brandon v. State*, 778 P.2d 221, 223–24 (Alaska App.1989) this court rejected Brandon's claim that the trial court erred in failing to suppress evidence which the police derived from the search of Brandon's residence.

■ We reject Brandon's attempt to relitigate this issue. The doctrine of the law of the case prohibits the reconsideration of

---

**1.** J.B.'s grand jury testimony was not, however,     introduced as evidence at trial.

issues that this court has adjudicated in a previous appeal in the same case. *Wolff v. Arctic Bowl, Inc.*, 560 P.2d 758, 763 (1977). We accordingly apply the law of the case doctrine and conclude that the disposition of this issue is controlled by our original decision in *Brandon v. State.*[2]

### BRANDON'S STATEMENT TO THE MAGISTRATE

Brandon next contends that Superior Court Judge John Reese erred in denying Brandon's motion to suppress the statement which he made before Magistrate Williams. In the patrol car after the March 7 arrest, Officer Daily advised Brandon of his *Miranda* rights, and Brandon asserted his right to remain silent. At the initial hearing shortly thereafter, Magistrate Williams did not fully advise Brandon of his rights as set out in Criminal Rule 5(c).[3] Magistrate Williams told Brandon, "At a bail hearing I have the officer tell me what kind of a case he has against you. It may seem one-sided to you but I'm not going to ask you anything about the facts of the case. The reasons for that is that because what you say could be used against you later on.... It's not always in your best interest to talk about the case at this time." After the police officer recounted the facts of the offense, Brandon provided his address and other booking information. Magistrate Williams then set bail at $10,000. Brandon then made the following statement:

> Your honor. If I could have a chance to explain something. I tried to offer to the officers. But my wife came in this afternoon she was already beaten. I'm not the one that beat her. See I took care of her. I gave her a bath. I put ice packs

on her face. I ran and got her ice water, you know. She has a boyfriend that lives right there in the neighborhood. This is not the first time this has happened and she's accused me of it, you know. And I tried to give, she gave his name, and address, and telephone number that I tried to give to the officers and they refused to take it from me.

Magistrate Williams then asked, "And what was, what was his name?" Brandon stated:

> His name is [G.L.] I don't have the telephone number and the address. But my wife had some charges like this against me just a few months ago which she changed her story on and told the truth about this boyfriend of hers.[4] And he just lives about a block away. And she spends a lot of time, in fact, she spends about as much time there as she did and more time than she stayed at home. Lately I've been the one taking care of the children.

Brandon moved to suppress this statement as a violation of his constitutional rights and of Rule 5(c). Judge Reese denied the motion, finding that the statement was unsolicited and voluntary. The prosecutor played the tape recording of Brandon's statement at trial.

Brandon does not assert the constitutional issue on appeal but argues that the fact that the magistrate did not inform him of all the information within Criminal Rule 5(c) mandates suppression of his statement and reversal of his conviction. The state argues that there was no violation of Brandon's constitutional rights, that the purpose of Rule 5(c) is to ensure that a defendant does not make involuntary or coerced

---

**2.** *See also Moreau v. State*, 588 P.2d 275, 280 (Alaska 1978) (court will rarely find plain error from failure to raise search and seizure issue). The *Moreau* case buttresses our conclusion that this issue is not an exceptional one requiring reexamination.

**3.** Rule 5(c) provides in part that the magistrate:
> (3) shall inform the defendant
> (i) of his right to retain counsel, and
> (ii) of his right to request the assignment of counsel if he is unable to obtain counsel, and

> (iii) of his right to have a preliminary examination, and
> (4) shall inform the defendant that he is not required to make a statement and that any statement may be used against him. The judge or magistrate shall allow the defendant reasonable time and opportunity to consult counsel and shall admit the defendant to bail as provided by law and by these rules.

**4.** Judge Reese excluded this sentence from the evidence because of the prejudicial effect of the reference to prior similar charges.

statements, and that Brandon's statement was voluntary and therefore should not have been suppressed.

We believe this issue is controlled by *Padgett v. State*, 590 P.2d 432, 435–36 (Alaska 1979). In *Padgett* the police took the defendant before a judge as is required by Criminal Rule 5(a). The judge advised Padgett of his rights under Criminal Rule 5(c) and appointed an attorney for him. *Id.* at 436. However the attorney was not present at the hearing. During the discussion on bail, "Padgett volunteered an arguably incriminating statement which was admitted at the trial." Padgett contended that admission of this statement violated his right to counsel and right to remain silent under the state and federal constitutions. The supreme court concluded that the Rule 5 proceeding was not a "critical stage requiring assistance of counsel." The court stated:

> With regard to the fifth amendment claim, the fact that a defendant at a Rule 5 proceeding is unrepresented by counsel should not preclude him from speaking on the matter of bail. If he makes an unsolicited incriminating statement in the course of his remarks, it will be admitted if it is voluntary. (Footnote omitted.)

■ *Padgett* is distinguishable from the present case in one major respect: in *Padgett* there was no suggestion that the judge did not comply with Criminal Rule 5(c). However, we believe that *Padgett* is controlling in the present situation and allows the state to admit Brandon's statements if the statements were unsolicited and voluntary. Judge Reese found that the first part of Brandon's statement, the part before the magistrate asked the question, was unsolicited and voluntary. This finding is not clearly erroneous. There does not appear to be any connection between the magistrate's failure to inform Brandon of his rights under Criminal Rule 5(c) and Brandon's volunteered statement. Officer Daily had advised Brandon of his *Miranda* rights and Brandon had asserted his right to remain silent shortly before the Rule 5 hearing. Furthermore, although it is uncontested that Magistrate Williams did not comply with Criminal Rule 5(c), the magistrate did caution Brandon about discussing the facts of the case. We therefore conclude that Judge Reese did not err in admitting the first part of Brandon's statement.

■ However, during Brandon's statement, Magistrate Williams asked Brandon the name of the person that he claimed assaulted his wife. Given this question by the magistrate, we conclude that Judge Reese was clearly erroneous in finding that the portion of Brandon's statement which followed this question was unsolicited. We therefore assume, without deciding, that admission of this portion of Brandon's statement was error. However, it does not appear that this second part of the statement added anything of substance to the first part of Brandon's statement other than the name of the person that Brandon claimed assaulted his wife. Since Brandon consistently claimed that this was the name of the person who assaulted his wife, we conclude that the admission of the second portion of Brandon's statement was harmless error.

## INDICTMENT

■ Brandon next contends that this court should dismiss the indictment in this case because the prosecutor advised the grand jury that the state could present expert psychological testimony regarding the "battered woman syndrome." Brandon contends that this offer to present expert testimony amounted to testimony by the prosecutor, masquerading as advice. Criminal Rule 12(b) and (e) required the defendant to raise objections to the indictment before trial. Brandon did not do this. This court therefore reviews the matter as a matter of plain error, and the appellant bears a heavy burden to convince this court to review an objection to an indictment that the appellant waived by not raising it in a pretrial motion. *Betts v. State*, 799 P.2d 325, 329 (Alaska App.1990); *Gaona v. State*, 630 P.2d 534, 537 (Alaska App.1981). We conclude that these remarks did not constitute plain error.

## DOUBLE JEOPARDY

Brandon next contends that Judge Reese erred in denying his motion to dismiss his case on double jeopardy grounds. As we have previously stated, Brandon was tried three times on these charges. Superior Court Judge Ralph E. Moody presided over the first trial. At Brandon's first trial, the prosecutor objected to Brandon's cross-examination of a witness and remarked, "If the defendant wants to take the stand, he can take the stand." After argument the next day, regarding the prosecutor's remark, Judge Moody ruled, "I find nothing in this as intentional." The parties then stipulated to a mistrial, and Judge Moody made the following comments:

But I think it's clear in this case, that—what the district attorney did, and I find it inadvertent. I see no action on her part to indicate that she's out to get this person, or to do anything underhanded, and it's just one of those things that occur. And I don't feel there's any intentional thing on her part, and it's something that just unfortunately happens, with people doing their best intentions, and in view of that, and in all fairness to the defendant, I think it will be—[confirming that the parties would stipulate to a mistrial]—and I think it's a good solution to it. I feel that I was—my opinion is, I would have granted a mistrial, but not on the basis that the state intentionally did this, but on the basis that it was something that shouldn't have been done, but it was, and it was inadvertent, therefore a mistrial is granted.

Brandon's second trial and conviction followed. Brandon appealed, and this court reversed. The state elected to retry Brandon. At a hearing before his third trial, Brandon, now represented by different counsel, asked Judge Reese to hold that a new trial was barred by double jeopardy based on prosecutorial misconduct that occurred in the first trial which resulted in the mistrial. Judge Reese denied this motion. Judge Reese appears to have concluded that the best course of action was to rely on the record as it existed at that time

rather than attempt to conduct an evidentiary hearing, given the passage of time since the incident which resulted in the mistrial in the first trial. He adopted Judge Moody's finding that the prosecutor's conduct had been "inadvertent."

In *Pruitt v. State*, 829 P.2d 1197 (Alaska App.1992), we stated that prosecution will be barred when a mistrial is declared because of prosecutorial misconduct only if "it is clear that the prosecutor, motivated by a desire to avoid an acquittal in a case which is going badly, engages in purposeful misconduct which forces the court to declare a mistrial[.]" *Id.* at 1201 quoting *Muller v. State*, 478 P.2d 822, 827 (Alaska 1971). Alaska courts have also left open the possibility that a defendant may be able to prevail on double jeopardy grounds where the prosecution causes a mistrial through gross negligence. *Piesik v. State*, 572 P.2d 94, 97 n. 16 (Alaska 1977); *Loveless v. State*, 634 P.2d 941, 944 (Alaska App.1981).

■ Whichever standard applies, we conclude that Judge Reese did not abuse his discretion in refusing to grant Brandon's motion to dismiss on double jeopardy grounds. At the time that Judge Moody granted Brandon's mistrial motion during Brandon's first trial, Judge Moody made findings that the prosecutor's conduct was not intentional and was "something that just unfortunately happens, with people doing their best." This finding appears to preclude a finding that the prosecutorial misconduct rose to a level which would prevent a retrial. Brandon never asked Judge Moody to expand on this finding or asked for an evidentiary hearing. He did not contest this issue until long after the event: after a retrial and successful appeal and before his third trial. Under these circumstances, Judge Reese could properly rely on the facts in the record and Judge Moody's contemporaneous finding. We conclude that Judge Moody's findings are supported by the record, and we affirm Judge Reese's decision adopting Judge Moody's findings and denying Brandon's double jeopardy motion.

## CONFRONTATION: J.B.'S STATEMENT TO KAY WHITE

Brandon next contends that Judge Reese erred in allowing Kay White, the intake counselor at the AWAIC Shelter where J.B. went after she was beaten, to testify to the statements which J.B. made which identified Brandon as the person who had beaten her. This court has previously ruled, in the original *Brandon* decision, that these statements were admissible as excited utterances. *Brandon*, 778 P.2d at 225–26. Brandon now argues that admission of these statements violated his constitutional right to confront the witnesses against him. U.S. Const. amend. VI; Alaska Const. art. I, § 11.

In a proceeding out of the presence of the jury, J.B. refused to testify whether anyone had assaulted her and whether she had previously made statements in which she had accused Brandon of assaulting her. J.B. asserted her constitutional right not to incriminate herself. J.B. stated that she would testify if the state offered her use and transactional immunity. The prosecutor refused to offer any form of immunity. The state presented Kay White's testimony at trial. The same day, this court issued its opinion in *State v. Echols*, 793 P.2d 1066 (Alaska App.1990), a decision in which this court affirmed a trial's court's dismissal of charges under Criminal Rule 43. The trial court in *Echols* had dismissed the charges in the face of the state's refusal to grant immunity to a critical defense witness. In light of the *Echols* opinion, the state offered J.B. use immunity. Judge Reese ordered J.B. to testify, and J.B. agreed to testify at trial if called. However, despite Brandon's assertions that he intended to call J.B. as a defense witness, neither Brandon nor the state called the immunized J.B. to testify.[5]

■ We have previously concluded that J.B.'s statements to Kay White were properly admissible as excited utterances under Alaska Evidence Rule 803(2). An excited utterance is a "firmly rooted hearsay exception" and, consequently, admission of out-of-court statements under this exception does not violate the confrontation clause, at least under federal law. *White v. Illinois*, —— U.S. ——, 112 S.Ct. 736, 742–43, 742 n. 8, 116 L.Ed.2d 848 (1992); *Bourjaily v. United States*, 483 U.S. 171, 181–84, 107 S.Ct. 2775, 2782–83, 97 L.Ed.2d 144 (1987). We have reached a similar conclusion in two recent cases. *Dezarn v. State*, 832 P.2d 589, 592 (Alaska App.1992) (excited utterance); *Toney v. State*, 833 P.2d 15, 17 n. 2 (Alaska App.1992) (conspirator statements). However in neither case did the appellant argue that although admission of the statement did not violate the confrontation clause of the United States Constitution, we should reach a different result under the confrontation clause of the Alaska Constitution. Assuming that there are situations where we would apply the confrontation clause of the Alaska Constitution more strictly to preclude some hearsay statements which are admissible under the confrontation clause of the United States Constitution, we do not believe that the present case presents an appropriate circumstance to so rule. From the record it appears that Brandon could have called J.B. to testify had he chosen to do so. His failure to do so appears to have been a tactical decision on his part. J.B.'s testimony to Kay White came into evidence under a well-established hearsay exception. Brandon contends that J.B.'s statement to Kay White was unreliable, because J.B. testified at grand jury that she had been beaten by someone other than Brandon and testified that she had not told the truth to Kay White. However, Brandon was free to admit this statement, and any other inconsistent statements which J.B. had made, under Evidence Rule 806. We accordingly conclude that Judge Reese did not violate Brandon's confrontation rights by allowing

---

5. In *State v. Gonzalez*, 825 P.2d 920, 936 (Alaska App.1992), we held that the prosecution was required to grant transactional immunity to require a person to give up his right against self-incrimination under article 1, section 9 of the Alaska Constitution. *Gonzalez* was decided well after the trial of this case. Since J.B. indicated that she was willing to testify based on the prosecution's offer of use immunity, it appears that J.B. would have testified if called by either party and that our decision in *Gonzalez* has no bearing on the present case.

Kay White to testify to J.B.'s statements to her.

## CONFRONTATION: J.B.'S STATEMENTS TO SGT. GIFFORD

Brandon next contends that Judge Reese erred in allowing Sgt. Gifford to explain why he did not examine the belt and broom which he found at Brandon's house for fingerprints. Brandon contends that Gifford's response, which relied on statements which J.B. made to Gifford, violated his constitutional right to confront J.B.

At trial, Brandon cross-examined Sgt. Gifford extensively about his investigation in Brandon's home. Brandon asked Gifford whether he attempted to take finger prints from the broom and the belt the police found at the house; Gifford answered that he had not. Brandon did not allow Gifford to explain why not. On redirect examination, the prosecutor asked Gifford to explain why he had not attempted to take finger prints from the broom and belt. Brandon objected on hearsay and confrontation grounds. The prosecutor asked the court to rule that the statement "would be only offered to show why the officer processed [the evidence] the way he did and failed to take certain items of evidence." Judge Reese overruled Brandon's objection, and Gifford testified, "In this situation, [J.B.] had told me that the assault had occurred in the living room, that it occurred by her husband." Gifford explained that, because the police investigation of the house, including finding a belt with a pattern matching the injury Gifford had seen on J.B.'s back, confirmed J.B.'s story of the assault, the police had not searched the broom and belt for finger-prints to determine the identity of the assailant.

Brandon does not renew his hearsay challenge on appeal, apparently conceding that the statement was introduced for a nonhearsay purpose. Instead, Brandon argues that the statement was irrelevant, that its prejudicial effect on the jury outweighed any probative value, and that its admission violated his right to confront J.B.

We conclude that Judge Reese did not err in admitting Sgt. Gifford's testimony. Brandon had vigorously cross-examined Sgt. Gifford about the investigation which he did of Brandon's home. He particularly pointed out that Sgt. Gifford had not examined the broom and belt for fingerprints. Gifford's reason for not taking such steps to identify an assailant—that J.B. had identified her assailant as Brandon—was relevant in light of Brandon's cross examination. *Cf. Walker v. State,* 674 P.2d 825, 831–32 (Alaska App.1983). In general, the admission of an out of court statement for a nonhearsay purpose does not violate the defendant's constitutional right to confront the witnesses against him. *Betts v. State,* 799 P.2d 325, 332 (Alaska App.1990); *Stumpf v. State,* 749 P.2d 880, 894 (Alaska App.1988), *cert. denied,* 490 U.S. 1070, 109 S.Ct. 2075, 104 L.Ed.2d 639 (1989).

As we have previously pointed out, J.B.'s initial statement that Brandon was the one who assaulted her was already properly admitted as an excited utterance through the testimony of Kay White. The fact that J.B. had made statements accusing Brandon was already before the jury. J.B. was available for Brandon to question if he chose to do so. Under these circumstances we conclude that Judge Reese did not err in allowing Sgt. Gifford to explain, in the face of Brandon's attack on cross-examination, why he had not attempted to have the broom and belt examined for fingerprints.

## CONFRONTATION: PLACEMENT OF R.B. IN THE COURTROOM

Brandon next contends that Judge Reese violated Brandon's right to confront the witnesses against him by his placement of R.B. in the courtroom. R.B.'s guardian ad litem requested that R.B. be allowed to testify from a small chair and table in the courtroom rather than from the witness stand. Prior to this request, Judge Reese had heard testimony on a motion by the state to exclude Brandon's mother, Judy Wagner, from the courtroom while R.B. testified. In support of that motion the

state presented the testimony of Dr. Clemen Lewis, who testified that R.B. was "particularly afraid of testifying against his father, knowing his father will be here in the court." Judge Reese had a small table and chairs set up in the courtroom from which the boy would testify. Judge Reese stated, "I have arranged the boy's chair which is more or less perpendicular to his father. [Defense counsel] is somewhat in front of [R.B.], ... he can probably see his father out of the corner of his eye. It is not really different from where their positions would be if he were in the regular witness chair." Brandon disagreed with this description and had his investigator take photographs which appear in the record. Brandon argues that the seating arrangement violated his right to confront R.B.

In *Blume v. State*, 797 P.2d 664 (Alaska App.1990) the trial court excluded the defendants from the courtroom while their five-year-old daughter testified as a prosecution witness. The defendants watched the proceedings from behind a one-way mirror in a room adjacent to the courtroom. In *Blume* we found that this arrangement violated the Blume's constitutional right to confront the witnesses against them. We stated:

> [T]he constitution forbids denying the accused face-to-face confrontation with an accuser in a criminal trial absent specific evidence and an express finding that the probable effect of the defendant's presence on the witness would significantly impair the substance of the witness's tes-

timony. A mere finding of some general, or *de minim[i]s* effect will not suffice. Likewise, generalized, subjective impressions or assumptions will not substitute for case-specific evidence. (Footnote omitted.)

*Id.* at 674. However, *Blume* and the United States Supreme Court decisions upon which it relies deal with the situation where a witness is completely excluded from the courtroom or where the defendant and witness cannot see each other at all.[6] The parties have not cited us to any helpful cases which discuss the issue of the witnesses' placement in the courtroom and confrontation.[7] The cases which we have found seem to allow the trial judge to move a witness around in the courtroom as long as the defendant and witness are angled so that they may see each other. The limits of this principle do not seem to be clearly differentiated. For instance, in *Stanger v. State*, 545 N.E.2d 1105, 1112 (Ind.App. 1989), the child witnesses testified from a witness chair placed "at a slight angle toward the jury and away from the accused." The appellate court noted:

> The procedure utilized here did not prevent Stanger from hearing or seeing the child witnesses. It did not prevent the witnesses from being heard or seen by the judge or jury. Neither did it prevent the witnesses from hearing or seeing Stanger. Stanger's only objection is that the witnesses were not facing directly at him.

---

6. In *Coy v. Iowa*, 487 U.S. 1012, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988), the trial court allowed the state to place a one-way screen between child witnesses and the defendant. The screen prevented the two child witnesses in a child abuse case from seeing the defendant as they testified at trial. *Id.* at 1014–1015, 108 S.Ct. 2798, 2799–2800, 101 L.Ed.2d 857, 862–63. The Supreme Court held that this arrangement violated the defendant's right to confront the witnesses against him. In *Maryland v. Craig*, 497 U.S. 836, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990), the Supreme Court upheld a state statutory procedure which allowed a child to testify by one-way closed circuit television. The *Blume* Court held that such a procedure could be constitutional, but only if there was specific evidence and an express finding "that the probable effect of the defendant's presence on the witness

would significantly impair the substance of the witnesses' testimony." *Blume*, 797 P.2d at 674.

7. The state cites *State v. Hoyt*, 806 P.2d 204, 209–10 (Utah App.1991). However, *Hoyt* is a case where the defendant did not object to the placement of the witness at trial. The court in *Hoyt* notes that the record in the case is deficient and shows only that "defendant and his counsel were seated at the table customarily used by the prosecution and vice versa at the request of the prosecution and absent any objection at trial from the defendant." *Id.* at 209. The court concluded that "we find no constitutional requirement that an accused be able to establish eye-contact with a witness who is looking straight ahead." *Id.* at 210.

*Id.* The court held that no individualized showing of necessity for the chair placement was necessary because the defendant had failed to establish any deprivation of confrontation. The court held that the right to confrontation "does not confer upon the accused the absolute privilege of compelling a particular seating arrangement." *Id.* at 1114.

In the instant case, there was testimony in the record which supported Judge Reese's exercise of discretion to move R.B. somewhat in the courtroom. *See* AS 12.-45.046(f).[8] Although we have photographs of the chairs in the courtroom, it is difficult for us to tell what the relationship would have been between R.B. and Brandon at the time R.B. testified. Our view of the record convinces us that Judge Reese's finding that R.B.'s position relative to his father was "not really different from where their positions would be if he were in the regular witness chair" was not clearly erroneous. It also appears from the record that Judge Reese did not require Brandon's attorney to question R.B. from a particular part of the courtroom. Had Brandon's counsel chosen to question R.B. from either the podium or the normal defense counsel's chair, R.B. would have been required to face directly toward Brandon to face counsel. We accordingly conclude that Brandon's right of confrontation was not infringed.

### PSYCHOLOGICAL EXAMINATION OF R.B.

■ Brandon next contends that Judge Reese erred in denying his pretrial motion to conduct a psychological examination of R.B. Brandon contended that he needed to conduct a psychological examination of R.B. to determine whether R.B., who was

six years old at the time of the third trial, could adequately remember the assault which R.B. claimed to have observed three years earlier. Brandon also argued that the examination could help determine whether R.B.'s custody with J.B.'s family over the succeeding three years had interfered with R.B.'s recall, whether R.B. would be emotionally and mentally able to testify about the event, and whether confronting Brandon in front of a jury would affect R.B.'s testimony. Judge Reese denied the motion noting that Brandon had not raised any particular factual or psychological issue to warrant a psychological examination.

The decision whether to order a psychiatric evaluation of a witness is within the trial court's discretion. *Jonas v. State,* 773 P.2d 960, 964 (Alaska App.1989). Because the trial court must balance the competing values of the prosecution witness' privacy and the defendant's right to a fair trial, this court will not reverse the trial court's decision not to grant an evaluation unless the defendant makes a strong showing that the witness' psychiatric condition is material to the case. *Moor v. State,* 709 P.2d 498, 508 (Alaska App.1985).

In *Pickens v. State,* 675 P.2d 665, 668-69 (Alaska App.1984), this court held that, to establish that a psychiatric examination of a witness is necessary and should be compelled, the defendant must demonstrate that there is little or no evidence against the defendant to corroborate the witness' testimony and that there is specific good cause to believe that a psychological evaluation would show that the witness' veracity when testifying would be substantially impaired.

8. AS 12.45.046(f) provides as follows:

If the court does not find under (a)(2) of this section that the testimony by the child victim or witness under normal court procedures will result in the child's inability to effectively communicate, the court may, after taking into consideration the factors specified in (b) of this section, supervise the spatial arrangements of the courtroom and the location, movement, and deportment of all persons in attendance so as to safeguard the child

from emotional harm or stress. In addition to other procedures it finds appropriate, the court may

(1) allow the child to testify while sitting on the floor or on an appropriately sized chair;

(2) schedule the procedure in a room that provides adequate privacy, freedom from distractions, informality, and comfort appropriate to the child's developmental age; and

(3) order a recess when the energy, comfort, or attention span of the child warrants.

In order to be able to require R.B. to undergo a psychological evaluation, Brandon needed to establish a specific foundation that such an examination was necessary. In *Pickens* we stated:

> Defense counsel's speculation that a psychiatric examination of the victim might turn something up does not amount to a showing of necessity justifying a court-ordered evaluation. We think that, at the very least, it would have been incumbent upon Pickens to make a specific showing of good cause to believe, first, that [the victim's] ability to perceive events accurately or to relate those events truthfully was substantially impaired and, second, that this impairment was of such a nature that a psychological evaluation would be likely to confirm its existence or provide material information as to its scope.

*Id.* at 669. Here Brandon merely speculated that R.B.'s age and the passage of time and other factors would make him an unreliable witness. He made no showing that a psychological examination would be likely to provide material information. We accordingly conclude that Judge Reese did not err in denying Brandon's motion for a psychological examination of R.B.[9]

## CONFRONTATION: R.B.'S PRIOR INCONSISTENT STATEMENTS

■ Brandon next contends that the admission of R.B.'s prior inconsistent statements into evidence violated his right to confront R.B. Brandon argues that, at the time of trial, R.B. had forgotten the specifics of any assault he might have witnessed, that R.B.'s testimony did not render the testimony of other state witnesses relating R.B.'s prior inconsistent statements to them admissible, and that R.B.'s lack of memory deprived Brandon of his constitutional right to confront R.B. concerning the prior statements. Brandon's arguments have little merit.

At trial, R.B. testified that he had seen "my dad hurt [J.B.]" at his house when he was three years old and that J.B. had gone to the hospital as a result. R.B. testified that he remembered seeing Brandon "put her in a car seat, my brother's car seat," and "hit her." R.B. did not remember what color the car seat was or what Brandon had used to hit J.B. R.B. testified that Brandon was acting "[m]ean" and that no other man came by the house that day or "hurt mommy" that day. R.B. remembered that J.B. later left to go to the hospital, that the police took Brandon to jail that night, and that two police officers took R.B. and his younger brother in a police car to his aunt's house. However, he did not remember visiting J.B. in the hospital and asking her "why daddy had spanked her so hard." R.B. did not know how the broom, which the state entered into evidence, had been broken into two parts and did not remember telling the police that "daddy had broken the broom spanking mommy." Nor did R.B. recognize the belt entered into evidence or remember helping the police locate the belt behind a trash can upstairs at the Brandon home. R.B. did not remember telling a police officer that he had seen Brandon hit J.B. with the belt or tie her up. R.B.'s aunt, Dolores Allen, Officers Daily and Brewster, and Sergeant Gifford then testified to R.B.'s prior inconsistent statements to them.

Brandon first argues that these prior inconsistent statements were inadmissible hearsay. Brandon argues that because R.B. did not remember making the statements to Allen and the police, he was an "unavailable" declarant under A.R.E. 804(a)(3). Therefore, Brandon argues, because A.R.E. 804 contains no hearsay exception for prior inconsistent statements of an unavailable declarant, the statements

---

9. Brandon argues that because Judge Reese later relied in part on testimony from a psychologist in deciding to exclude Brandon's mother from the courtroom during R.B.'s testimony, Brandon had a right to conduct a psychological examination of R.B. *See Anderson v. State,* 749 P.2d 369, 371–72 (Alaska App.1988). First, Brandon never renewed his request for a psychological examination during trial. Second, the mere fact that a psychiatrist testified, out of the presence of the jury, that R.B. would feel stress when testifying in the presence of Brandon and other family members did not require that Brandon be able to conduct a separate psychological examination.

were erroneously admitted. This argument lacks merit. A.R.E. 801(d)(1)(A) applies regardless of whether the declarant is available or unavailable. We conclude that the statements were properly admissible as prior inconsistent statements under A.R.E. 801(d)(1)(A).

Brandon next argues that admitting the prior statements violated his right to confront R.B. However, because R.B. was present and available for cross-examination at trial, even a total loss of memory of the substance or circumstances of his prior statements would not violate Brandon's constitutional right to confront the witness. *United States v. Owens*, 484 U.S. 554, 559–60, 108 S.Ct. 838, 842–43, 98 L.Ed.2d 951 (1988). R.B., however, did not claim a total lack of memory. He testified to his version of the incident. Brandon was able to cross-examine R.B. on this version.

### EXCLUSION OF JUDY WAGNER

Brandon next contends that Judge Reese erroneously excluded Brandon's mother, Judy Wagner, from the courtroom during R.B.'s testimony. Brandon argues that this exclusion violated his constitutional right to a public trial.

R.B.'s guardian ad litem requested that the courtroom be cleared of all unnecessary people during R.B.'s testimony. The prosecutor informed Judge Reese that the former Alaska Statute allowing the trial judge to clear the courtroom had been repealed but asked Judge Reese to ensure that R.B. not be unduly intimidated by Wagner's presence in the courtroom. The prosecutor called Dr. Clemen Lewis, a psychiatrist who had seen R.B. three times, as a witness in support of the motion. Dr. Lewis testified in an evidentiary hearing before the court that R.B. would suffer additional stress and anxiety if he testified while Brandon's relatives were present. When asked on cross-examination whether the presence of family members might affect R.B.'s ability to testify to the truth, Lewis answered that if R.B. changed his story that he had seen Brandon beating J.B., the change would be a result of "family pressure." R.B.'s aunt, Dolores Allen,

testified at the hearing that R.B. had told her that Wagner had stated in his presence that Brandon had not beaten J.B. and that someone else had. Allen testified that R.B. had felt confused by what Wagner had said. Allen testified that J.B. had then told R.B. that Wagner had not been telling the truth and that J.B. knew who had really beaten her. Judge Reese then found that R.B. was aware that Wagner "had a version of the facts that she wanted him to testify to" and that it would cause R.B., who would already be under stress, additional harm to testify while Wagner was present in the courtroom. Under AS 12.-45.046(f), which allows the trial court to effect "other procedures it finds appropriate" when the testimony of a witness under age thirteen may be impaired by normal court procedure, Judge Reese ordered Wagner, who was then present, to be absent from the courtroom when R.B. testified the next morning. Brandon objected to this ruling.

This court has recently held, as a general rule, that "the broader the closure order becomes, the more compelling the interest sought to be protected must be. Concomitantly, each closure, whether limited or complete, whether based on substantial justification or overriding compelling interest, must be made sparingly on a case-by-case basis in which the judge carefully balances the right of public trial against the interests to be protected by the closure." *Renkel v. State*, 807 P.2d 1087, 1091–92 (Alaska App.1991). When partially or totally closing the courtroom, the trial judge must make specific findings so that the record supports a legitimate reason for closure, consider alternatives before ordering closure, and fashion the closure order to be no broader than necessary. *Id.* at 1092.

In both *Renkel* and the subsequent case of *Mitchell v. State*, 818 P.2d 688, 689 (Alaska App.1991), this court reversed because the trial courts had totally closed the courtroom to the public during the testimony of children who were witnesses without making the findings necessary to justify

such an order.[10]  In this case, however, Judge Reese excluded only Wagner from the courtroom, and did so after an evidentiary hearing.  Judge Reese preserved the "public nature" of the trial and did make particularized findings.  Judge Reese's order was limited to one person whom he excluded from the courtroom during the testimony of one witness.  We believe that the evidence which Judge Reese had before him and the findings which he made justified this limited exclusion.  We accordingly find no error.[11]

## EXCLUSION OF EVIDENCE OF THE AUGUST 6, 1987, ASSAULT

■ Brandon contends that Judge Reese erred in ruling inadmissible evidence that J.B. was the victim of an assault at the time that Brandon was in prison awaiting his second trial.

In the early morning of August 6, 1987, the day of Brandon's second trial, the police responded to a call from J.B. and found some evidence that she had apparently been sexually assaulted, tied up, and beaten; J.B. was taken to the hospital.  At that time, J.B. told the police that she had just been beaten by G.L., who she claimed had also beaten her much more severely in March.  According to a police report of the incident, one of the police officers had known of a G.L.

The prosecutor moved to exclude any evidence of this assault, claiming that it was totally unrelated and would lead to confusion of the issues.  Judge Reese, after reviewing the police report and photographs, granted the state's motion.  Judge Reese found that, although the two incidents involved the same location and the same victim, there were so few similarities between the two assaults that the probative value of the evidence of the second incident to establish that Brandon did not commit the first assault was remote.  Judge Reese cited A.R.E. 403 and concluded that the police report and photographs would be likely to confuse the jury and mislead them.

Brandon argues that this ruling violated his constitutional right to "a meaningful opportunity to present a complete defense." *Crane v. Kentucky*, 476 U.S. 683, 690, 106 S.Ct. 2142, 2146, 90 L.Ed.2d 636 (1986).  Brandon argues that it was critical for him to show that J.B. had been assaulted in August of 1987, when Brandon was in jail, and had claimed that she had been assaulted by G.L.

Alaska Rule of Evidence 403 gave Judge Reese discretion to exclude evidence of the August incident if he found that "its probative value is outweighed by the danger of . . . confusion of the issues or misleading the jury."  In the event that Brandon wished to call J.B. to testify, he was free to call her to testify as to the March assault with which he was charged in this case.  He chose not to do that.  Had he called J.B., and had she testified to the March assault, her testimony as to the second assault might have been relevant.  However, without J.B.'s testimony, we think that the relevance of J.B.'s report of an assault by another man which Brandon presented to Judge Reese was highly attenuated.  We accordingly conclude that Judge Reese could properly exclude this information under A.R.E. 403.  *Cf. D'Antorio v. State*, 837 P.2d 727, 736 (Alaska App.1992).

## FINAL ARGUMENT

■ Brandon next contends that Judge Reese erred in denying his motion for a mistrial which was based on the prosecutor's remarks during closing argument.  This court will reverse the denial of a mis-

---

10.  In each case, the trial court had relied on former AS 12.45.048, now repealed, which had mandated such closure to the public upon prosecution request.  *Renkel* held that former AS 12.45.048 was unconstitutional.  *Renkel*, 807 P.2d at 1092–93.

11.  Although we find no error, it appears to us that it may have been possible for the trial court

to have accomplished its goal of insulating R.B. from Wagner by restricting her to the back of the courtroom.  No one at trial argued for this less restrictive alternative.  However, we would encourage trial courts to consider solutions short of excluding people from the courtroom if the court finds that a remedy short of exclusion is appropriate.

trial only when the trial court's decision is clearly erroneous. *Pinkerton v. State*, 784 P.2d 671, 674 (Alaska App.1989). We have reviewed the final arguments of counsel in light of the objections which Brandon raises on appeal. We note that Brandon did not make many of these objections in the trial court. We conclude that Judge Reese did not err in denying Brandon's motion for a mistrial.

## JURY INSTRUCTION

Finally, Brandon contends that Judge Reese should have instructed the jury on the circumstances under which hands and feet can be considered "dangerous instruments." Judge Reese instructed the jury on the statutory definition of "dangerous instrument" contained in AS 11.81.-900(b)(11). Brandon neither objected to the instruction nor raised this argument at trial. This court will examine the issue only for plain error. *Mossberg v. State*, 624 P.2d 796, 804–05 (Alaska 1981); *Wilson v. State*, 670 P.2d 1149, 1152–53 (Alaska App. 1983). We do not find plain error.

The conviction is AFFIRMED.

MANNHEIMER, J., not participating.